IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____

**ROBLOX CORPORATION,**

      **Plaintiff,**

v.                               Case No. 23-cv-5346

**THE INDIVIDUALS, CORPORATIONS, LIMITED
LIABILITY COMPANIES, PARTNERSHIPS
AND UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE A HERETO,**

      **Defendants.**
_____/

## MOTION TO DETERMINE ATTORNEYS' FEES TO AWARD TO BIGFINZ'S ATTORNEYS

Based on Plaintiff's bad faith litigation tactics, the Court ordered Roblox "to pay Bigfinz's attorney's fees for: (1) preparing the motion to vacate default and reply; (2) the motion to dismiss and reply; and (3) for appearing at hearings on October 26, 2023 and November 8, 2023." [Dkt. 85] at 5. On November 30, 2023, Bigfinz informed Plaintiff that it had incurred $18,567.00 in fees in defending against Plaintiff's claims. Plaintiff requested Bigfinz's billing records, which were immediately provided. Notably, there were only 29 time entries from 2 timekeepers, namely undersigned and my paralegal who has litigated hundreds of IP cases with me over 11+ years. Plaintiff then insisted the parties brief the attorney fee issue. As explained below, Plaintiff has failed to offer any basis to reduce Defendant's fees, and indeed has refused to comply with the Local Rules' requirement that Plaintiff provide evidence supporting its opposition to the claimed fees.

1

After 2 weeks of reviewing Bigfinz's 29 time entries without response, undersigned informed Plaintiff that if it would not respond to what it believed was or was not reasonable, undersigned would engage a fee expert and begin the process of drafting this brief and would further request the Court award Bigfinz the fees for briefing this fee motion and the expert's fees. Plaintiff then responded that it believed the fees were unreasonable, but did not provide any basis, other than to say Plaintiff's counsel "spent less then half the amount of time than what you and your associate billed on this." Plaintiff then offered to settle for a fraction of the fees incurred. Nor did Plaintiff even attempt to explain how Plaintiff's lack of diligence in pursuing its claims should somehow diminish what it cost Bigfinz to defend against them.

In response, undersigned re-reviewed the 29 time records it had sent to Plaintiff, looking at them with the most objective eye it could to try to verify Bigfinz was only pursuing fees for the specific items outlined in the Court's Order. Undersigned then rejected Plaintiff's proposed settlement and removed 7 time entries that Plaintiff could have argued were outside the scope of the fee award. This reduced the fee demand to $17,119.00. Plaintiff has refused to pay this.

Given Plaintiff's refusal, Bigfinz demanded Plaintiff provide the information required pursuant to L.R. 54.3, including the total amount Plaintiff has been billed, the total amount Plaintiff has been paid (including its share of any recoveries obtained), all billing rates for all timekeepers that have worked on the matter, and time records sufficient to show all work done on the file, particularly all pre-suit work. Plaintiff has refused to provide this information. Bigfinz requested this information both because the local rule requires it in fee disputes, and more importantly because undersigned took this case because of his outrage with the manner in which plaintiff is litigating these disputes. Defendant believes these detailed billing records will further demonstrate the entire impropriety of the manner in which these Schedule A cases are litigated and the great

2

danger they pose to any random person (like Bigfinz) who can get caught up in these Schedule A plaintiff's drastically overreaching and unreasonable enforcement campaigns.

While undersigned is appreciative of the Court's order properly sanctioning Plaintiff for the bad faith manner in which it has litigated, it genuinely does not appear to have learned any lesson from it. Pursuing claims under seal against hundreds of unrelated parties and then using those parties' resources as leverage against the defending parties by holding their money hostage while Plaintiff's counsel seeks to "negotiate" outrageous settlement amounts is antithesis to our system of justice.

Plaintiffs do not need these mass Schedule A cases to stop the alleged trademark violations they improperly convince the courts are taking place. There are a number of other tools that brand owners (including this specific plaintiff) use to stop online sales. They contact the platforms (Amazon, Teepublic, eBay, etc.) and use various takedown mechanisms provided by the platforms to stop the alleged ongoing harm. These Schedule A cases are rather an effort to simply create a monetary stream for contingent fee plaintiff's enforcement of specious claims. But these plaintiffs do not have any interest in actually litigating the merits as doing so is unlikely to work in plaintiffs' favor. So, instead, they convince the courts that all of these unrelated defending parties must be from China and must be engaged in some grand conspiracy with one another which harms not just the individual plaintiff, but the entire American system of commerce. Nonsense.

The case *sub judice* is the perfect example. The known total sales from all 260+ defendants is less than $300.00 – less than a single federal court filing fee. The brand owners apparently don't even necessarily know what is happening with their enforcement efforts. For example, famed country singer Luke Combs recently learned that his brand enforcement team had used these Schedule A cases to sue hundreds of unrelated defendants (just like this case), and held hostage a

3

sick woman's Paypal account having $11,000 in it. *See* [https://www.usatoday.com/story/entertainment/celebrities/2023/12/13/luke-combs-tumbler-lawsuit-copyright/71904965007/](https://www.usatoday.com/story/entertainment/celebrities/2023/12/13/luke-combs-tumbler-lawsuit-copyright/71904965007/) (last visited Dec. 26, 2023). There, the defendant had sold 18 tumblers. There, the plaintiff mislead the court and convinced it to enter a $250,000 statutory judgment award against the Florida-based defendant's 18 sales. While Mr. Combs attempted to do the right thing by doubling up the money in that defendant's bank account when he learned of this outrageous enforcement result, the damage to our justice system (and to that defendant) was already done. Mr. Combs and Plaintiff here are well-heeled. They do not have to deal with the issues of how to make the next utility or medical bill payment. But these unsuspecting defendants who are simply engaged in First Amendment protected fan activity relating to particular brands are not equipped to have their resources taken from them and held against their will while having to fight back for them.

      Our system of justice provides for a right of Due Process and we understand in that right that even if we're accused of wrongdoing, we will get an opportunity to be heard by an impartial tribunal and given an opportunity for the asserting party to actually have to prove up any claims it may bring, while giving the defending party an opportunity to explain why the plaintiff's claims are not correct. But these Schedule A cases turn this notion on its head. Plaintiffs gather up entirely unrelated parties into collections of literally hundreds or thousands of defendants and then convince the courts that all of these parties must have engaged in something similar to warrant combining them together. They then amplify this inappropriate litigation strategy by arguing that everything must be under seal because of the great harms they say will come if someone learns of these cases. And then when the courts give them the tools to learn that the hundreds or thousands of defending parties are not all in China operating a global conspiracy together, they ignore that

information and continue to mislead the court to obtain the most drastic of trademark or copyright remedies in the form of outrageous statutory damages and injunctions. Worse, they do this knowing that many of the defendants are in the United States and are entitled to actual service of process.

Bigfinz's defense cost what it cost. Courts in this district have regularly awarded plaintiffs $25-45k+ in attorneys fees for cases that involved less litigation than Bigfinz's defense. *See e.g. Danxiao Information Technology Ltd. v. Shenzhen Xiaoteng Technology Limited*, Case No. 22-cv-5835 [Dkt. 67] at ¶10 (awarding $45k + 30% contingency) (attached as Exhibit A); *ASHH, Inc. v. Tobacco Discount Wholesale*, Case No. 21-cv-6574 [Dkt. 38] at 1 (awarding $32k in an unopposed default) (attached as Exhibit B).

As explained in the accompanying declaration of lead counsel, undersigned counsel is an experienced intellectual property litigator and a professor of trademark law. *See* Exhibit C, Declaration of W. Pollack. The amount of fees that were incurred are reasonable for the time, effort, and experience required. Undersigned engaged an impartial third party expert to opine on the reasonableness of the fees incurred. Her declaration is attached as Exhibit D and demonstrates that the fees are reasonable.

It is near impossible for a defendant in a case like this to engage a lawyer to defend themselves in an effort to substantively secure a victory, as the economics involved will almost always require negotiating some type of settlement because that is cheaper than having to prove up a defense and because the plaintiffs are holding hostage the resources the defendants would use to secure counsel. And given the manner of these cases, the burden actually falls on the defendants to prove up their defenses, as opposed to requiring the plaintiff establish its claims. This is all because the plaintiffs mislead the courts into thinking there is a grand conspiracy including all of

the hundreds or thousands of defendants warranting extreme early relief including sealed pleadings, temporary restraining orders, preliminary injunctions, and asset seizures. Worse, the actions all take place behind the scenes with unsuspecting defendants learning of theses harms when their banks and financial institutions cut them off because plaintiffs convince the courts to allow service by email (which is not effective against U.S. citizens). But those email "services" usually go to the defendants spam folders and nobody sees them anyway.

Defendant defers to the Court's discretion what the final amount of that sanction should be. Concerning the fees awarded, Defendant requests its fees of $17,119.00 plus $3,868 in fees incurred in connection with preparing this motion, pls $3,300 in fees incurred by Dineen Wasylik in preparing her expert report for a total fee award of $24,287. Defendant notes the irony that this fee award approximately equals the amount of Defendant's money Plaintiff held hostage to use as a bargaining chip in this litigation.

Defendant also requests discovery into the pre-suit investigation undertaken by Plaintiff and believes the Court (and all other courts that permit these Schedule A cases) would benefit by learning how the pre-suit investigation likely does not match the level of concern that these plaintiffs raise to the courts through their sealed motions for temporary restraining orders and preliminary injunctions. Notably, numerous courts are concerned with permitting these types of Schedule A cases because of precisely the kind of harm they do to defendants like Bigfinz. *See A SAD Scheme of Abusive Intellectual Property Litigation*, 123 Columbia Law Review Forum 183, 195 (2023) (attached as Exhibit E).

Whatever the harms these Schedule A cases argue to the courts that permit early injunctive relief, these cases harm our system of justice. *See id*. 123 Columbia Law Review Forum at 185 ("The SAD Scheme has likely affected hundreds of thousands of online merchants and deprived

6

the federal government of a quarter-billion dollars of court filing fees.") The harms the Court is aware of that were done to Bigfinz are regular in these Schedule A cases. *See id*. at 191-192 n.33:

> As one defendant explained:
> Gorge [(the rightsowner)] . . . subjected NeoMagic [(the defendant)] to a short barrage of sealed litigation intended to secretly shut down NeoMagic's business, seize NeoMagic's marketplace (typically listing more than 100,000 products daily), and freeze NeoMagic's funds (in excess of $300,000) based upon the sale of a single unit of a $4.99 product . . . . Gorge still demanded payment of $9,500 for Gorge to release the over $300,000 of NeoMagic money that remained frozen (crippling NeoMagic's ability to do business).

Defendant Bigfinz is not alone in having had to defend against specious claims. Bigfinz was unique, however, in that it fought back and would not give in to claims that the Court correctly described as "ridiculous."

## CONCLUSION

Defendant respectfully requests the Court determine the amount of fees that Roblox must pay Defendants' counsel, compel Plaintiff to produce the information required by L.R. 54.3, and award any other relief the Court determines is just.

## CERTIFICATE OF CONFERENCE

As early as November 30, 2023, undersigned conferred with counsel for Plaintiff to resolve this matter without the need for the Court's intervention. To date, counsel for Plaintiff has not agreed to pay undersigned's fees in connection with the Court's order dated November 29, 2023 [Dkt. 85]. Further, on December 14, 2023, undersigned requested counsel for Plaintiff's information pursuant to L.R. 54.3. Undersigned sent follow-up emails to counsel for Plaintiff on December 18, 2023, December 19, 2023, December 21, 2023, and December 26, 2023 requesting same. To date, counsel for Plaintiff has not provided such information.

| | |
|---|---|
| Date: December 29, 2023 | */s/ Woodrow Pollack* <br> Woodrow H. Pollack <br> *Admitted Pro Hac Vice* <br> Florida Bar No. 26802 <br> **SHUTTS & BOWEN, LLP** <br> 4301 W Boy Scout Blvd <br> Suite 300 <br> Tampa, FL 33607 <br> (813) 463-4894 <br> wpollack@shutts.com <br><br> ***Counsel for Defendant Bigfinz*** |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 29, 2023 a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.

*/s/ Woodrow H. Pollack*
Woodrow H. Pollack